1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE SAUL ZAENTZ COMPANY d/b/a/
TOLKIEN ENTERPRISES,

               Plaintiff,

   v.

WOZNIAK TRAVEL, INC.,

               Defendant.

_____/

No. C 06-5421 MHP

**<u>MEMORANDUM & ORDER</u>**

**Re: Motions for Summary Judgment**

      Defendant Wozniak Travel, Inc. ("Wozniak Travel") has operated, since 1976, a Minnesota-based travel agency named "Hobbit Travel."  Plaintiff, Saul Zaentz Company d/b/a Tolkien Enterprises ("Tolkien Enterprises"), owns the right to use and license others to use marks related to novelist J.R.R. Tolkien's books *The Hobbit*, first published in the United States in 1938, and its sequel *The Lord of the Rings* trilogy, first published in the United States in 1954, 1955, and 1956. The term "Hobbit" refers not only to the title of J.R.R. Tolkien's first novel, but also refers to the race of small, human-like creatures who inhabit the mythical world of Middle Earth in which Tolkien's novels are set.  Plaintiff alleges that Wozniak has used and continues to use the "Hobbit" mark unlawfully.  Tolkien asserts various federal and state causes of action for trademark infringement, trademark dilution, and unfair competition, and seeks both monetary and injunctive relief.

Now before the court are the parties' cross-motions for summary judgment on whether the affirmative defense of laches bars plaintiff's claims. Having considered the arguments of the parties and the papers submitted, and for the reasons stated below, the court GRANTS defendant's motion and DENIES plaintiff's motion. Defendant has also moved for summary judgment as to the merits of plaintiff's infringement, dilution and unfair competition claims, but because resolution of the laches issue in favor of defendant is dispositive, the court does not reach those additional issues. Rather, each of plaintiff's claims against defendant is DISMISSED.

BACKGROUND

I.      J.R.R. Tolkien's *The Hobbit* and *The Lord of the Rings*

The late J.R.R. Tolkien was a British citizen, professor and author who coined the term "Hobbit" to refer to the race of fictional three-foot tall, human-like creatures who are the central characters in his novels *The Hobbit: Or There and Back Again* (hereinafter "*The Hobbit*") and *The Lord of the Rings* trilogy. Battle Dec. ¶¶ 6–7; Givan Dec., Exh. 10 ¶¶ 4, 11. *The Hobbit* was first published in the United States in 1938, while *The Lord of the Rings*, the sequel to *The Hobbit* comprising three individual volumes, was first published in the United States in 1954, 1955, and 1956. Battle Dec. ¶¶ 3–4. The Hobbit characters feature prominently in both books. Since their publication, both *The Hobbit* and *The Lord of the Rings* have been in print continuously. Id. ¶ 5. In 1965 Ballantine Books published in the United States authorized paperback versions of *The Hobbit*, which sold 6.2 million copies between 1967 and 1978, and *The Lord of the Rings*, which sold 12.4 million copies during the same time period. Givan Dec., Exh. 13 ¶¶ 12–13; Exh. 10 ¶¶ 10, 17. During the 1960s and 1970s, Tolkien's books garnered national media attention, with various newspaper articles appearing in *The New York Times*. Givan Dec. ¶¶ 117–119, Exhs. 35–37 ("The Prevalence of Hobbits", January 15, 1967; "Good Lord, It's Frodo Baggins," June 14, 1970; "Behind the Best Sellers: J.R.R. Tolkien," October 2, 1977). When George Wozniak opened his travel agency in Minnesota in 1976, the Concise Oxford Dictionary defined the word "Hobbit" as: "one of an imaginary race of half-sized persons in stories by J.R.R. Tolkien (E. writer d. 1973 and said by him to mean hole-dweller)." Givan Dec., Exh. 10 ¶ 19. Since their initial publication and

UNITED STATES DISTRICT COURT
For the Northern District of California

2

re-release as paperbacks, both *The Hobbit* and *The Lord of the Rings* have remained commercially viable.  Hansen Dec. ¶ 3.  Between 1980 and 2007, Houghton Mifflin sold 4.9 million authorized copies of *The Hobbit* and 13.1 million authorized copies of *The Lord of the Rings*.  Id.

J.R.R. Tolkien's novels have been extended to a variety of entertainment and merchandising outlets, beginning in at least the early 1970s.  In conjunction with its license to publish the 1965 paperback versions of *The Hobbit* and *The Lord of the Rings*, Ballantine Books also obtained the right to market related paper merchandise such as calendars, cards and posters.  Givan Dec., Exh. 13 ¶ 10.  Ballantine Books obtained these rights from J.R.R. Tolkien's British publisher.  Givan Dec., Exh. 10 ¶ 10, Exh. 13 ¶ 10.  Beginning in 1972, Ballantine Books published the first authorized series of J.R.R. Tolkien calendars which included a 1976 wall calendar and a 1978 desk calendar both entitled "The Hobbit."  Givan Dec., Exhs. 13 ¶ 14, 26D, 26AA.

In 1969, United Artists Corporation acquired the rights to produce motion pictures, stage and television programs, and merchandise based on J.R.R. Tolkien's literary works.  Bendich Dec. ¶ 4.  United Artists acquired these rights from J.R.R. Tolkien's British publisher and executor, which in turn had acquired the rights directly from J.R.R. Tolkien himself.  Id.  By 1977 United Artists had received "hundreds" of requests for permission to use marks related to J.R.R. Tolkien's works, including the "Hobbit" mark.  Givan Dec., Exh. 14 ¶ 8. These requests were for various products including board games, bookmarks, ceramic sculptures, chess sets, posters, jewelry, leather goods, linens, maps, painting sets, pictures of fine art, puppets, restaurant services, stationery, and t-shirts.  Id. ¶ 9.  United Artists refused each of these licensing requests, preferring to coordinate merchandising of Tolkien goods with the release of a motion picture film.  Id. ¶ 10.

No film was released until November 1977, following plaintiff Tolkien Enterprises's acquisition of the entertainment and merchandising rights from United Artists in December 1976.  Bendich Dec. ¶¶ 4, 6.  Directed by Jules Bass and Arthur Rankin, Jr., the 1977 animated television film of *The Hobbit* was nationally publicized in 1976 and 1977 prior to its release.  Id. ¶ 6.  In connection with the animated film, Hobbit merchandise—including Hobbit posters, a coffee table book, records, puzzles and a board game—was nationally advertised and sold.  Givan Dec., Exhs. 26G–H, 26J.  Although the television film was unauthorized when it began production, the Tolkien

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Estate and Tolkien Enterprises threatened legal action, and the film and its related merchandise

2    became authorized through a series of settlement agreements.  Bendich Dec. ¶ 7.  A sequel to the

3    1977 film, *The Return of the King—A Story of the Hobbits*, was released on television in May 1980,

4    and was also eventually authorized by settlement agreement.  Id.  Both the 1977 and 1980 television

5    films remain commercially available for home viewing today.  Id. ¶¶ 6, 13.

6        In the mid-1970s, plaintiff Tolkien Enterprises produced an animated theatrical film of *The*

7    *Lord of the Rings*, directed by Ralph Bakshi.  Id. ¶ 16.  Released in movie theaters in 1978, the film

8    was distributed and advertised by United Artists and was announced as the largest advertising

9    campaign in United Artists' history.  Id. ¶ 17.  In addition to full-page ads in newspapers of nineteen

10    major U.S. cities, the advertising campaign included theater trailers, full-page ads in major

11    magazines, a 1-hour network television special on J.R.R. Tolkien, and a float in the Macy's

12    Thanksgiving Day Parade.  Id.  Tolkien also engaged in various merchandising efforts in connection

13    with the film including board games, puzzles, and figurines related to the Hobbit characters.  Givan

14    Dec., Exhs. 26K, 56, 26O.  The Bakshi film garnered a Golden Globe nomination and has grossed

15    approximately $30 million in the United States since its release.  Battle Dec. ¶ 13.

16        More recently, New Line Cinema became Tolkien Enterprises's licensee to create films and

17    related merchandise based on Tolkien's literary works.  Bendich Dec. ¶ 23.  Between 2001 and 2003

18    New Line Cinema released three separate films directed by Peter Jackson, each representing one

19    installment of *The Lord of the Rings* trilogy—*The Fellowship of the Ring*, *The Two Towers*, and *The*

20    *Return of the King*.  Battle Dec. ¶ 40.  The final installment of the trilogy won the 2003 Academy

21    Award for Best Picture.  Id. ¶ 41.  All three individually rank among the top 20 highest-grossing

22    films of all time in the United States and they have grossed more than $1 billion domestically.  Id.

23    Like the films that came before them, the New Line Cinema films were accompanied by a

24    merchandising campaign for items such as toys, collectibles, interactive games, stationery, books,

25    and apparel.  Imhoff Dec. ¶ 2.  Various items have been sold under the Hobbit mark.  Drotos Dec.

26    ¶¶ 21, 23, 24.  New Line Cinema recently announced its intention to produce and distribute two

27    more motion pictures based on J.R.R. Tolkien's *The Hobbit*.  Id. ¶ 9.

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

Tolkien Enterprises and its licensees use the Internet as a marketing channel to advertise, promote and sell Tolkien related products and entertainment.  New Line Cinema established an authorized website, www.lordoftherings.net, in May 1999 to generate and maintain interest in *The Lord of the Rings* films.  Drotos Dec. ¶ 14.  Since at least September 2001, this website has been linked to New Line Cinema's online shop at shop.newline.com where visitors can purchase products, including Hobbit products, related to the films.  Id. ¶ 15.  Licensed goods are also available online through licensee's websites (e.g., www.thehobbitgame.com) and third-party Internet retailers' sites (e.g., www.amazon.com).  Id. ¶¶ 16–39.  Tolkien Enterprises has acquired various Internet domain names including www.thehobbit.com which it acquired in July 1998 and is currently automatically re-routed to www.tolkien-ent.com.  Id. ¶ 12.  The website www.tolkien-ent.com, among other things, provides information regarding Tolkien Enterprises's rights relating to the Tolkien works, contact information for licensing inquires, and information regarding selected current licensees and their websites.  Id.  Tolkien Enterprises has also acquired forty additional domain names that incorporate the Hobbit mark.  Id. ¶ 42.

In addition to the marketing of movies and merchandise, Tolkien Enterprises or its licensees have also, from time to time, marketed travel-related goods and services.  Since 1982, Tolkien Enterprises has licensed a nature trail in the redwood forests of Humboldt County, California which recreates the journey of *The Hobbit* and is advertised on the Internet.  Givan Dec., Exhs. 18 at 162:16–165:8, 18H.  In connection with the recent 2001–2003 film trilogy, Tolkien Enterprises's licensee New Line Cinema entered into a two-year agreement with Air New Zealand in 2002 to market the carrier as "Airline to Middle-earth."  Battle Dec. ¶ 43; Imhoff Dec. ¶¶ 10–12.  New Line Cinema added a travel category to its online shop, allowing Air New Zealand to offer vacation packages to website visitors, and also offered official movie merchandise and movie premieres as prizes to stimulate travel on Air New Zealand.  Imhoff Dec. ¶¶ 10–11.  The airline also painted depictions of the Hobbit characters on its jets and distributed miniature versions of these painted jets as collectibles.  Id.  In the future, Tolkien Enterprises expects that New Line Cinema will engage in similar travel promotions in connection with the anticipated release of *The Hobbit* movie.  Id. ¶ 44. Finally, Tolkien Enterprises licensed Kevin Wallace Limited to produce a stage musical based on

1   *The Lord of the Rings* which premiered in Toronto, Canada in March 2006 and in the West End in

2   London in June 2007.  Battle Dec. ¶ 45.  In connection with the sale of musical tickets, Kevin

3   Wallace Limited engaged in travel promotions on its website and with Virgin Atlantic and Jet

4   Airways.  Id. ¶¶ 46–49.  To promote the Kevin Wallace stage musical, passengers on Virgin Atlantic

5   flights into the United Kingdom received a travel pack containing flight socks tagged with the

6   slogan "May the hair on you toes never fall out," a quote from *The Hobbit* book.  Id. ¶ 48.

7        Tolkien Enterprises has over one hundred registered trademarks for various Tolkien-related

8   marks, including five current and five expired United States registrations for Hobbit marks.  One

9   registration dated April 1977 is incontestable.  The registrations for Hobbit marks are for various

10   products including, "apparatus sold as a unit for playing a parlor game"; "toy action figures and

11   accessories therefor"; "figurines"; "printed matter, namely posters, art prints, postcards"; "computer

12   game software"; and "downloadable video game software."  Barrett Dec., Exh. 1.  None of the

13   trademark registrations are for use of the Hobbit mark in connection with travel goods and services.

14        Tolkien Enterprises has engaged in various trademark enforcement efforts.  After acquiring

15   its rights in late 1976, Tolkien Enterprises took action against a number of unauthorized users.

16   Many unauthorized users, after receiving cease-and-desist letters informing them of Tolkien

17   Enterprises's rights, entered into license agreements or simply discontinued their unauthorized use.

18   See e.g., Bendich Dec. ¶¶ 26, 32-40; Exhs. 21–28.  At times, Tolkien's enforcement efforts have

19   required significant litigation activity.  In 1982, Tolkien Enterprises agreed to dismiss and settled a

20   case following the court's decisions on summary judgment.  See Superior Models, Inc. v. Tolkien

21   Enterprises, 1981 WL 40556, 211 U.S.P.Q. 876, (D. Del. Aug. 14, 1981).  The plaintiff Superior

22   Models, Inc., a manufacturer and marketer of miniature metal figurines, agreed to take a license

23   from Tolkien Enterprises and pay royalties in exchange for certain ancillary rights provided by

24   Tolkien Enterprises. Bendich Dec. ¶¶ 41–42.  Another enforcement effort resulting in litigation

25   occurred in the 1990s and involved AT&T's plan to use the term Hobbit to describe one of its

26   microprocessors.  Tolkien Enterprises disputed AT&T's planned use of the mark, communications

27   between counsel led to a trademark opposition, and litigation ensued in 1995 when Tolkien

28   Enterprises filed a complaint for trademark infringement against AT&T in the Northern District of

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Illinois.  Ultimately, AT&T recognized Tolkien Enterprises's rights in the Hobbit mark, assigned its

2   trademark registrations to Tolkien Enterprises, and ceased using the mark.  Id. ¶¶ 44–46.

3

4   II.      Wozniak's Hobbit Travel

5           George Wozniak, owner and founder of defendant Wozniak Travel, opened the Minnesota-

6   based travel agency Hobbit Travel in 1976.  Wozniak Dec. ¶ 3.  When Wozniak opened Hobbit

7   Travel in 1976 he did so in partnership with the Chicago-based travel agency Hobbit International,

8   which also did business under the name Hobbit Travel.  Wozniak Dec., Exh. M, 44:4–15.  In

9   business since 1969, Hobbit International was founded by a group of college professors who picked

10  the name Hobbit International because they thought their students would be familiar and identify

11  with the name having read the J.R.R. Tolkien books.  Abramson Supp. Dec., Exh. A, 233:15–22;

12  Givan Dec., Exh. 33, 18:9–19:21.  When Wozniak was a college student, the Chicago-based Hobbit

13  International employed him as a representative on Minnesota campuses, promoting and selling its

14  vacation packages in 1974 and 1975.  In the summer of 1975, Wozniak moved to Chicago to work

15  for Hobbit International full-time.  Wozniak Dec., Exh. M, 29:17–30:1.  While he was working in

16  Chicago, Wozniak attended a children's production of a play based on *The Hobbit*, and he started

17  but did not finish reading the book.  Givan Dec., Exh. 31, 209:18–212:21.

18          When Wozniak returned to Minnesota in 1976 to open his own travel agency, he agreed by

19  handshake to share the profits from his new office 50/50 with Hobbit International.  Id., 44:4–15.

20  The new Minnesota office initially operated as "Wozniak's Hobbit Travel," but the travel agency

21  soon shortened its name to "Hobbit Travel" because, according to Wozniak, customers and agents

22  had difficulty spelling and remembering the name Wozniak.  Id., 54:11–20, 208:2–8.  Wozniak

23  Travel and Hobbit International ended their profit-sharing arrangement by handshake at an unknown

24  date in the 1970s, possibly when Wozniak Travel incorporated in 1977.  Abramson Dec., Exh. A,

25  133:12–23, 244:24–247:13.  Wozniak Travel and Hobbit International maintained business ties after

26  they severed the profit-sharing agreement.  Id., 125:18–126:2.  For some time in the 1990s, Wozniak

27  Travel paid for advertisements in the Chicago area that included Hobbit International's contact

28  information.  Id., 169:20-170:19, 171:11-173:17.  This advertising arrangement arose under

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Wozniak Travel's wholesale arm "Trilogy Tours," which is distinct from the retail arm operating as

2   "Hobbit Travel."  Wozniak Dec., Exh. M, 59:6–60:13.  Under the advertising agreement, Wozniak

3   Travel bought advertising for local travel agencies, such as Hobbit International, which then sold

4   airline tickets purchased wholesale from Wozniak Travel.  Id.  Hobbit International later went out of

5   business in 1998.  Id., 35:14–21.

6        In addition to the Chicago-based Hobbit International, Wozniak Travel also does business

7   with a Wisconsin-based travel agency called Friedman's Hobbit Travel.  Wozniak Supp. Dec., Exh.

8   M, 362:1–11.  In 1982, David Friedman, a former campus representative for Wozniak Travel,

9   informed Wozniak that he planned to open his own travel agency in La Crosse, Wisconsin.  Givan

10  Dec., Exh. 4, 44:1–20.  Wozniak and the other owners of Wozniak Travel gave Friedman

11  information about the travel business, offered advice, answered "a lot of questions" and helped him

12  open the La Crosse, Wisconsin travel agency.  Wozniak Supp. Dec., Exh. M, 359:1–18.  Wozniak

13  Travel contemplated a franchise relationship with Friedman, but ultimately decided that such an

14  arrangement was not financially realistic.  Wozniak Travel took no ownership interest in Friedman's

15  travel agency, and Wozniak told Friedman, "Dave, good luck and I hope everything goes well."  Id.,

16  359:13–360:12.

17       Today, Friedman's Hobbit Travel is a three-employee travel agency serving La Crosse,

18  Wisconsin, a city of 50,000, and the surrounding area, which includes La Crescent, Minnesota,

19  directly across the Mississippi River from La Crosse.  Friedman Dec. ¶ 3; Abramson Supp. Dec.,

20  Exh. B, 35:6–7.  Although Friedman's Hobbit Travel has registered an internet domain name, it has

21  never established an internet website and limits its print advertisements to the *La Crosse Tribune*

22  and the newspaper of the University of Wisconsin at La Crosse.  Abramson Supp. Dec., Exh. B,

23  53:6–8, 68:5–12, 80:20–81:20.  Friedman believes that he has the continuing right to use the name

24  "Friedman's Hobbit Travel" in connection with his travel agency, as he has done since 1982.  Givan

25  Dec., Exh. 4, 40:9–12.  Defendant Wozniak agrees that Friedman has that right.  Givan Dec., Exh. 3,

26  496:14–17.  Wozniak Travel exercises no control over how Friedman uses the Hobbit Travel name.

27  Givan Dec., Exh. 4, 40:17–41:4; Exh. 3, 362:12–15.  Wozniak Travel sells wholesale travel services

28  to Friedman's Hobbit Travel and maintains businesses ties with the Wisconsin travel agency, but

8

1   does not otherwise monitor the agency's business operations.  Givan Dec., Exh. 4, 47:10–48:10,

2   50:5–25; Wozniak Supp. Dec., Exh. M 362:1–11.

3         Aside from use of the name Hobbit, defendant Wozniak Travel's storefront signs and logos

4   do not invoke names, characters, places or images from the Tolkien works.  Wozniak Dec., Exh. F.

5   A sampling of hundreds of Hobbit Travel's advertisements, brochures, posters, invoices, customers

6   confirmations and letterhead dating back to at least the early 1980s likewise suggests no connections

7   to names, characters, places or images from the Tolkien works.  Wozniak Dec., Exhs. E–G.  Since

8   1976, Hobbit Travel's logo has featured the travel agency's name and a drawing of a 727 jet.  Id.  At

9   times, Wozniak Travel has also used the slogan "The Low Fare Company" paired with the name

10  Hobbit Travel.  Id.  Both the 727 jet and the slogan "The Low Fare Company" have been featured on

11  the Hobbit Travel website since its launch.  Wozniak Dec., Exh. K.

12        Wozniak Travel has adopted terms related to J.R.R. Tolkien's works for various components

13  of its business.  The company's 401(k) plan is named the "Tolkien Trust."  Givan Dec., Exh. 31,

14  79:6–83:2.  In addition to the retail business of Hobbit Travel at issue here, Wozniak Travel also

15  runs "Trilogy Tours" as its wholesale company selling travel packages to other travel agencies.

16  Wozniak Dec., Exh. M, 83:1–22.  Trilogy Tours was originally named and run by Hobbit

17  International, but Wozniak Travel took over the business, it appears, in the 1980s.  Id.  In 2006,

18  Wozniak Travel briefly named its new computer servers Bilbo, Gandalf and Frodo, which are all

19  major characters in J.R.R. Tolkien's works.  Wozniak Dec., Exh. 25, 44:9–15.  Upon connecting the

20  servers to the company network, Wozniak Travel changed the server names to MAINPDC,

21  MAINANTIVIRUS and MAINHCD.  Id., 46:15–25.

22        Since its inception thirty years ago, Wozniak Travel has grown steadily to become the largest

23  travel agency in Minnesota.  Wozniak Dec., Exh. M, 328:3–8.  By 1984, the business included three

24  retail offices and over 50 employees.  Abramson Dec., Exh. C1.  In the decade before this action was

25  filed, Wozniak Travel booked trips for 2.5 million passengers, approximately 300,000 of whom were

26  neither Minnesota nor Wisconsin residents, and maintained a mailing list with more than 400,000

27  recipients, over 100,000 of whom are from outside Minnesota.  Ewald Dec. ¶¶ 2-3, Exh. A.  All told,

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   Wozniak Travel has made over $1 billion in travel sales in its thirty-year history.  Wozniak Dec.,

2   Exh. D; Exh. M, 328:3-8.

3         Wozniak Travel has spent more than $10 million on promotions to generate this business.

4   Wozniak Dec. ¶ 6.  Beginning in 1977, advertisements for Hobbit Travel appeared in leading

5   regional papers including the *Minneapolis Star Tribune* and *St. Paul Pioneer Press*. Wozniak Dec.

6   ¶ 8.  Wozniak Travel increased its advertising expenditures from a few thousand dollars annually in

7   the late 1970s to over one million dollars in 2000. Wozniak Dec. ¶ 6, Exhs. D1–27.   Wozniak also

8   personally promoted his business through television and radio appearances along with newspaper

9   interviews.  Beginning in the late 1970s, Wozniak appeared on local television shows to discuss

10  travel.  Wozniak Dec., Exh. M, 288:7–24.  Such appearances increased overtime as Wozniak, as a

11  representative of Hobbit Travel, reached national audiences in two Oprah Winfrey Show

12  appearances in 1990 and 1992 and again in at least three national news broadcasts on the Today

13  Show, World News Tonight, and the CBS Evening News in the late 1990s and early 2000s.  Id.

14  Wozniak and his travel agency Hobbit Travel have also appeared in radio broadcasts and hundreds

15  of newspaper articles since the 1980s. Wozniak Dec ¶ 6; Abramson Dec., Exhs. C1-338.  In

16  promoting Hobbit Travel,. Wozniak claims that he has never discussed J.R.R. Tolkien or the films

17  related to his works.  Wozniak Dec. ¶10.  Wozniak does not recall having been questioned by an

18  interviewer, caller or audience member on television or radio about a connection between Hobbit

19  Travel and J.R.R. Tolkien.  Id.

20        Wozniak Travel first established an online presence in 1996 with the registration of the

21  domain name www.hobbittravel.com.  Wozniak Dec., Exh. N, Ans. to Int. No. 4., 11.  Though exact

22  records are unavailable, Wozniak Travel's website was activated by at least 2000.  Id.  Between

23  2003–2005, Wozniak Travel expanded the scope of its internet presence by offering direct internet

24  sales and purchasing more domain names, such as www.hobbitcruise.com and

25  www.hobbitdeals.com.  Givan Dec., Exh. 23, 36:19-37:1, 93:11-95:5.  Earliest available statistics

26  show that Wozniak Travel's website received 400,000 views in 2002 and approximately 1 million

27  views per year thereafter.  Scherbel Dec., Exhs. A, B.  More than 25 percent of these views are from

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    computer users in different time zones than Wozniak Travel's Minnesota offices.  Id.  In 2005, less

2    than 1% of Wozniak Travel's retail sales occurred online; by 2008, online purchases remained less

3    than 10% of Wozniak Travel's retail sales.  Ewald Dec., Exh. A.

4

5    III.    The Present Controversy

6            Tolkien Enterprises claims that it learned of Wozniak Travel in November 2003 due to

7    Wozniak Travel's growing internet presence.  Givan Dec., Exh. 24, 36:13–16.  In 2004, New Line

8    Cinema sent Wozniak Travel a cease-and-desist letter requesting that Wozniak Travel not operate its

9    business as Hobbit Travel.  Id., Exh. 32, 504:7–19.  Wozniak Travel continued to operate as Hobbit

10   Travel, and in 2005 filed an application to register Hobbit Travel as a mark with the United States

11   Patent and Trademark Office ("USPTO").  Id.  Tolkien Enterprises submitted a Letter of Protest

12   against Wozniak Travel's application and filed this lawsuit in September 2006.  Barrett Dec. ¶ 40.

13   During the course of this litigation, Wozniak Travel withdrew its UPSTO application with prejudice

14   in 2007.

15          Tolkien Enterprises initiated the present suit alleging five causes of action.  Under federal

16   law, Tolkien Enterprises alleged (1) trademark infringement, 15 U.S.C. § 1114, (2) unfair

17   competition and false designation of origin, 15 U.S.C. § 1125(a), and (3) trademark dilution, 15

18   U.S.C. § 1125(c).  Complaint ¶¶ 47–62.  Tolkien Enterprises brought California state law claims of

19   (4) trademark dilution, Cal. Bus. & Prof. Code § 14330, and (5) unfair competition, Cal. Bus. &

20   Prof. Code § 17200 et seq.  Id., ¶¶ 63–74.  Tolkien Enterprises pled for monetary and injunctive

21   relief, seeking treble damages based on Wozniak Travel's profits made while using the name Hobbit

22   and a court order barring Wozniak Travel's future use of the name Hobbit Travel.  Id.  Wozniak

23   Travel counterclaimed with one cause of action, seeking declaratory relief that it may continue to

24   operate as Hobbit Travel.  Def.'s Answer.

25          In the motions now before the court, Wozniak Travel moves for summary judgment on five

26   separate grounds, arguing that all of Tolkien Enterprises's claims are barred by laches, the state law

27   unfair competition claim is barred by the statute of limitations, the infringement claims fail because

28   there is no likelihood of confusion, and the dilution claims fail because the Hobbit mark was not

11

1   famous in 1976 when Wozniak Travel opened its travel agency and alternatively, because there is no

2   likelihood of dilution.  Tolkien Enterprises opposes Wozniak Travel's motion and in addition, has

3   filed its own motion for partial summary judgment.  Tolkien Enterprises argues that Wozniak

4   Travel, by granting naked licenses to both the Chicago-based Hobbit International and the

5   Wisconsin-based Friedman's Hobbit Travel, has abandoned any rights to the Hobbit mark and, as a

6   result, is precluded as a matter of law from demonstrating the prejudice element of a laches defense.

7

8   LEGAL STANDARD

9       Summary judgment is proper when the pleadings, discovery, and affidavits show that there is

10   "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

11   matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

12   proceedings.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material

13   fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

14   nonmoving party.  Id.

15       The party moving for summary judgment bears the burden of identifying those portions of

16   the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material

17   fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may "move with or

18   without supporting affidavits for a summary judgment in the party's favor upon all or any part

19   thereof." Fed. R. Civ. P. 56(a).  "Supporting and opposing affidavits shall be made on personal

20   knowledge, shall set forth such facts as would be admissible in evidence, and shall show

21   affirmatively that the affiant is competent to testify to the matters started therein." Fed. R. Civ. P.

22   56(e).  On an issue for which the opposing party will have the burden of proof at trial, the moving

23   party need only point out "that there is an absence of evidence to support the nonmoving party's

24   case." Id.

25       Once the moving party meets its initial burden, the nonmoving party must go beyond the

26   pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

27   genuine issue for trial." Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving

28   party's allegations.  Id.; see also Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir.

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    1994).  The court may not make credibility determinations, <u>Anderson</u>, 477 U.S. at 249, and

2    inferences drawn from the facts must be viewed in the light most favorable to the party opposing the

3    motion.  <u>Masson v. New Yorker Magazine</u>, 501 U.S. 496, 520 (1991).

4         The fact-dependent nature of trademark law often does not allow for resolution on summary

5    judgment.  <u>Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1140 (9th Cir. 2002).  However,

6    summary judgment is still appropriate in trademark suits when no dispute remains as to genuine

7    issues of material fact.  <u>Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n</u>, 465

8    F.3d 1102 (9th Cir. 2006).  Notably, a "district court may properly grant summary judgement on the

9    basis of laches."  <u>American Int'l Group, Inc. v. American Int'l Bank</u>, 926 F.2d 829, 831 (9th Cir.

10   1991); <u>see</u> also <u>Jarrows</u>, 304 F.3d at 833–834 (affirming grant of summary judgment to defendant on

11   the basis of laches, holding that district court, under de novo standard of review, did not

12   inappropriately resolve disputed material facts in reaching its decision, and holding that district

13   court, under either abuse of discretion or clear error standard of review, did not err in its application

14   and balancing of the laches factors).

15

16   <u>DISCUSSION</u>

17        Plaintiff and defendant have filed cross-motions for summary judgment on the issue of

18   whether the affirmative defense of laches bars relief in this case.  "Laches is an equitable time

19   limitation on a party's right to bring suit, . . . resting on the maxim that 'one who seeks the help of a

20   court of equity must not sleep on his rights.'" <u>Jarrow Formulas, Inc. v. Nutrition Now, Inc.</u>, 304 F.3d

21   829, 835 (9th Cir. 2002).  As the party asserting laches, defendant Wozniak Travel must show that

22   "(1) [the plaintiff's] delay in filing suit was unreasonable, and (2) [it] would suffer prejudice caused

23   by the delay if the suit were to continue."  <u>Id.</u> at 838.  The Ninth Circuit has directed courts to weigh

24   a host factors in deciding whether plaintiff's delay was unreasonable.  <u>Tillamook Country Smoker,</u>

25   <u>Inc. v. Tillamook County Creamery Ass'n</u>, 465 F.3d 1102, 1108 (9th Cir. 2006); <u>E-Systems, Inc. v.</u>

26   <u>Monitek, Inc.</u>, 720 F.2d 604, 607 (9th Cir. 1983).  These factors include: "(1) strength and value of

27   the trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if

28   relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior

13

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    users; and (6) extent of harm suffered by the junior user because of senior user's delay." E-Systems,

2    720 F.2d at 607 (quoting Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 293 F.Supp. 892, 917

3    (S.D.N.Y. 1968), *affirmed and modified*, 433 F.2d 686, 703–704 (2d Cir. 1970)). Ultimately, as an

4    equitable doctrine, the denial of relief on the basis of laches is not determined by simple rules of

5    thumb or rigid legal rules. Carl Zeiss, 293 F.Supp. at 917. Rather, it is determined by "'a

6    consideration of the circumstances of each particular case and a balancing of the interests and

7    equities of the parties." Id.; see also 6 McCarthy on Trademarks and Unfair Competition § 31:22

8    (4th ed. 2007) (hereinafter "McCarthy").

9        As a threshold matter, the court notes that laches is an available defense to each of the claims

10   and relief sought in this case. Plaintiff asserts federal causes of action for trademark infringement

11   (Lanham Act § 32,15 U.S.C. § 1114(1)); unfair competition and false designation of origin (Lanham

12   Act § 43(a), 15 U.S.C. § 1125(a)); and trademark dilution (Lanham Act § 43(c), 15 U.S.C. §

13   1125(c)). Plaintiff also asserts state causes of action for trademark dilution (Cal. Bus. & Prof. Code

14   § 14330) and unfair competition (Cal. Bus. & Prof Code § 17200). Plaintiff seeks both monetary

15   and injunctive relief. "It is well established that laches is a valid defense to [federal] Lanham Act

16   claims." Jarrow Formulas, 304 F.3d at 835 (affirming application of laches to federal claim for false

17   advertising under Lanham Act § 43(a)(1)(B)); see also Tillamook, 465 F.3d at 1108–11 (affirming

18   application of laches to federal trademark infringement claim); 15 U.S.C. §§ 1125(c)(1), (c)(5)

19   (stating explicitly that injunctive and monetary relief for claims of trademark dilution are "subject to

20   the principles of equity"). Laches is also an available defense to plaintiff's state law dilution and

21   unfair competition claims. Jarrow Formulas, 304 F.3d at 842 (affirming application of laches to

22   California state law claim for unfair competition); Prudential Ins. Co. of America v. Gibraltar

23   Financial Corp. of Calif., 694 F.2d 1150, 1155 (9th Cir. 1982) (affirming application of laches to

24   California state law claims for dilution and unfair competition). Finally, laches is a bar to both

25   monetary and injunctive relief. See, e.g., Jarrow Formulas, 304 F.3d at 840; Prudential Ins., 694

26   F.2d at 1152.

27

28

14

UNITED STATES DISTRICT COURT
For the Northern District of California

I.      Unreasonable Delay

"A determination of whether a party exercised unreasonable delay in filing suit consists of two steps." Jarrow Formulas, 304 F.3d at 838.  "First, [a court] assess[es] the length of delay, which is measured from the time the plaintiff knew or should have known about its potential cause of action." Id.  Second, once a court determines the length of delay, a court must "decide whether the plaintiff's delay was unreasonable." Id.  The court will address each of these two prongs below.

A.      Length of Delay

The "knew or should have known" standard allows a laches defense to be based on either actual or constructive knowledge. Miller v. Glen Miller Productions, Inc., 454 F.3d 975, 980–981 (9th Cir. 2006).  Constructive knowledge is judged from an objective reasonable person standard, and therefore, a trademark owner is chargeable with the information it might have received had due inquiry been made. Id. (plaintiff "knew, or should *reasonably* have known" of defendant's activity) (emphasis added); see also 6 McCarthy § 31:38.  The constructive knowledge standard imposes on a trademark owner the duty to police its rights against potential infringers. See Grupo Gigante SA DE CV v. Dallo & Co. Inc., 391 F.3d 1088, 1102 (9th Cir. 2004) ("[c]ompanies expecting judicial enforcement of their marks must conduct an *effective* policing effort"); E-Systems, 720 F.2d at 607 ("[p]laintiff ought to have discovered defendant's use sooner had it been diligently seeking to enforce its mark").

Plaintiff invites the court to adopt a more stringent standard that constructive notice may be imputed only when it is "inconceivable" that a plaintiff was unaware of defendant's potential infringement.  Plaintiff's cited authority, however, does not support plaintiff's position.  Plaintiff cites to a recent case from the District of Oregon in which the court commented that "[t]o prove that a plaintiff knew or should have known of the defendant's allegedly wrongful activity, the defendant 'must make a showing that it would have been *inconceivable* that [the plaintiff] would have been unaware' of those activities." adidas Am., Inc. v. Payless Shoesource, Inc., 529 F. Supp. 2d 1215, 1251 (D. Or. Dec. 21, 2007) (emphasis added).  For this proposition, the court in adidas cited to Official Airline Guides, Inc. v. Churchfield Publications, Inc., 756 F. Supp. 1393, 1404 (D. Or.

15

1990), which in turn cited to <u>Georgia-Pacific v. Great Plains Bag Co.</u>, 614 F.2d 757, 759

(C.C.P.A.1980), which in turn cited to <u>Loma Linda Food Co. v. Thomson & Taylor Spice Co.</u>, 279

F.2d 522, 525 (C.C.P.A. 1960).

In <u>Loma Linda</u>, the court recognized that a laches defense may be based on either

constructive notice or acknowledge knowledge.  <u>Id.</u>  In the context of discussing how actual

knowledge may be established, the court in <u>Loma Linda</u> commented that when direct evidence is

unavailable, actual knowledge may nevertheless be found from circumstantial evidence showing "a

state of facts in which it is *inconceivable* that the party charged with laches in a trademark case

could have been unaware of the opposing party's use of the mark."  <u>Id.</u> (citing <u>Procter & Gamble</u>

<u>Co. v. J.L. Prescott Co.</u>, 102 F.2d 773, 779–80 (3d Cir. 1939)) (emphasis added).  Plaintiff's citation

to <u>adidas</u> and implicitly, to the cases preceding <u>adidas</u>, does not support plaintiff's position because

the "inconceivable" standard, as discussed by the court in <u>Loma Linda</u>, was used in connection with

establishing actual knowledge and was not used in connection with establishing constructive

knowledge.  Moreover, the Ninth Circuit has never adopted a more stringent standard requiring a

showing that plaintiff's unawareness is "inconceivable."  While facts tending to show that it is

"inconceivable" that plaintiff was unaware of defendant's activity are *sufficient* to establish

constructive notice, they are not *necessary* given the well-established reasonable person standard.

Relying on the existence of multiple trademark and business name search reports in

plaintiff's possession as well as on defendant's open and continuous use of the Hobbit Travel name,

defendant argues that plaintiff should have known of defendant's potentially infringing use long

before it commenced this action in 2006.  The court agrees.  As plaintiffs point out, the court is

mindful that although a trademark owner has a duty to police its rights against potential infringers, it

is "'not required to constantly monitor every nook and cranny of the entire nation and to fire both

barrels of [its] shotgun instantly upon spotting a possible infringer.'"  <u>adidas America, Inc. v. Kmart</u>

<u>Corp.</u>, 2006 WL 2044857, at *8 (D. Or. June 15, 2006) (citation omitted).  In this case, however,

plaintiff is not a trademark owner with few resources available to conduct a policing effort and

defendant's use of the Hobbit Travel mark has not been secretive, negligible, or sporadic.

16

1    In 1977, shortly after it acquired from United Artists the entertainment and merchandising

2  rights to J.R.R. Tolkien's novels, plaintiff retained outside counsel to advise and assist it in

3  trademark matters.  Abramson Dec., Exh. J. at 68:9–72:24.  On more than one occasion, plaintiff's

4  trademark counsel purposefully collected or otherwise received search reports whose precise

5  purpose was to alert the recipient to unauthorized uses.  A July 1977 report, based on searches of

6  trademark records at the U.S. Patent and Trademark Office and business names listed in trade

7  directories and in major city telephone directories, showed the Chicago-based Hobbit International,

8  but did not include information about plaintiff's Minnesota-based Hobbit Travel.  Abramson Dec.,

9  Exh. O1.  Likewise, another search report dated May 1977 and provided to outside counsel in the

10  early 1980s in connection with litigation to enjoin Superior Models, Inc. from selling miniature

11  figurines based on the Tolkien characters, also revealed Hobbit International, but not Hobbit Travel.

12  Abramson Dec., Exh. O3A.

13    Although neither the July 1977 nor the May 1977 search reports disclosed plaintiff's Hobbit

14  Travel, a subsequent search report ordered by plaintiff in September 1988—exactly eighteen years

15  before plaintiff commenced this action in September 2006—identified defendant Wozniak Travel of

16  St. Paul, Minnesota as the owner of Hobbit Travel.  The 1988 report also disclosed Wozniak

17  Travel's assumed name registration with the Minnesota Secretary of State.  Abramson Dec., Exh.

18  O4.

19    After 1988, Tolkien Enterprises was again informed of defendant's Hobbit Travel.  In

20  1992—fourteen years before the complaint was filed in this action—Tolkien Enterprises and AT&T

21  engaged in a series of communications after AT&T announced plans to market a microprocessor

22  under the Hobbit mark.  In a letter to plaintiff's outside counsel, AT&T noted that it had discovered

23  various uses of the Hobbit mark, including uses by travel agencies.  Abramson Dec., Exh. O5.

24  AT&T provided to Tolkien Enterprises three separate reports, each based on a search of a different

25  proprietary database of trademark registrations and business names.  Abramson Dec., Exhs. O6–O8.

26  Each of these reports disclosed plaintiff's Hobbit Travel and its Minnesota location.  Id. (Exh. O6 at

27  712; Exh. O7 at 15294; Exh. O8 at 15379).

28

In April 2000—six years before commencing this action—Tolkien Enterprises's counsel ordered a search report that, like the reports in 1988 and 1992, disclosed defendant's Hobbit Travel. Abramson Dec., Exh. O9 at 45115, 45117. This 2000 report disclosed Hobbit Travel's Minnesota address, telephone number, approximate sales, number of employees, principal officers, id., as well as Hobbit Travel's website domain name hobbittravel.com, id. at 45223. The report also included a 1995 newspaper article reporting that plaintiff's Hobbit Travel was, at that time, a $40 million travel agency. Id. at 45014.

The 1988, 1992, and 2000 search reports identifying defendant's Hobbit Travel were in plaintiff's possession, and yet, plaintiff conducted no further inquiry or investigation other than visiting defendant's hobbittravel.com website and printing out a screen-shot of the webpage on the same day it received the 2000 search report. Id. at 45224. Moreover, plaintiff took no action against defendant until plaintiff's licensee New Line Cinema sent a cease-and-desist letter in 2004. Givan Dec., Exh. 32, 504: 7–19. Plaintiff's own assertion that it has policed its marks, in part relying on search reports, is difficult to reconcile with its simultaneous claim of ignorance of the contents of those reports.

Had plaintiff conducted further investigation, as a reasonably prudent person would have done when confronted with successive search reports disclosing potentially infringing uses, it would have discovered that defendant had been operating a successful travel agency under the Hobbit mark openly and continuously for many years. Since its inception in 1976, defendant has sold approximately $1 billion in travel services under the name Hobbit Travel and has spent more than $10 million advertising the Hobbit Travel name. Wozniak Dec. ¶ 6; Exhs. D1–D27. Advertising has been continuous and widespread, covering a variety of regional and national media outlets including newspapers, magazines, television, and radio. Abramson Dec., Exhs. C1–338; Wozniak Dec. ¶ 8. By 1984—four years before plaintiff received the first search report disclosing defendant's Hobbit Travel—the travel company had three retail offices and over 50 employees. Abramson Dec., Exh. C1. By the 1990s—when plaintiff received the second search report—Hobbit Travel had received media coverage on national television in two Oprah Winfrey Show appearances in addition to coverage in hundreds of newspaper articles. Wozniak Dec., Exh. M, 288:7–24; Abramson Dec.,

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    Exhs. C1-338.  By the year 2000—when plaintiff received the third search report—Hobbit Travel

2    had already been operating successfully for almost twenty-five years and was generating tens of

3    millions of dollars in revenue.  Id. ¶ 6.  In the decade before this action was filed, Hobbit travel

4    booked trips for 2.5 million passengers and maintained a mailing list of more than 400,000

5    recipients.  Ewald Dec. ¶¶ 2–3, Exh. A.

6         Plaintiff does not dispute the existence and content of the 1988, 1992, and 2000 search

7    reports, nor does plaintiff dispute defendant's successful, open and continuous operation.  Plaintiff

8    insists, however, that summary judgment cannot be granted to defendant because its outside

9    trademark counsel has attested that she did not know about Hobbit Travel until November 2003

10   when she reviewed a search report ordered from an Internet domain name watch service.  Given

11   Dec., Exh. 24 at 36:13–16; Given Dec., Exh. 19 at 55:22–56:1.

12        While this testimony is sufficient to create a disputed issue of fact as to plaintiff's *actual*

13   knowledge, it is insufficient to create a disputed issue of fact as to plaintiff's *constructive*

14   knowledge.  Ninth Circuit precedent is clear that the "knew or should have known" standard is

15   disjunctive such that a laches defense can be based on *either* constructive *or* actual knowledge.  See

16   Glen Miller, 454 F.3d at 980 (rejecting argument that laches defense is "applicable only where the

17   trademark holder 'knowingly allowed' the infringing mark to be used without objection").  Given

18   that no genuine issues of material fact exist as to plaintiff's constructive notice, as is the case here, a

19   disputed issue of fact as to actual knowledge is not a *material* fact that would change the outcome of

20   the case for the purposes of summary judgment.  Id. at 980–981 (affirming district court's finding of

21   unreasonable delay on the basis of constructive knowledge, even though plaintiff's sworn testimony

22   that it did not have actual knowledge until much later was sufficient to create factual issue as to

23   actual knowledge).

24        Plaintiff relies on a recent case from the District of New Hampshire in which the court

25   denied summary judgment as to laches because although plaintiff's attorney had obtained a

26   trademark search report disclosing defendant's allegedly infringing use of plaintiff's mark, plaintiff

27   attested that it did not have actual knowledge until several years later.  Pro Trak Int'l, Inc. v.

28   Protracker Software, Inc., No. 05-CV-342-JM, 2007 WL 680766, at *2–3 (D.N.H. Mar. 1, 2007).

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Insofar as the court in <u>Pro Trak</u> required a showing of actual knowledge, <u>Pro Trak</u> is contrary to

2    Ninth Circuit precedent and does not help plaintiff.

3         Finally, plaintiff objects to defendant's use of trademark and business search reports, arguing

4    that they are hearsay in nature and cannot be used as evidence to show that plaintiff had notice of an

5    actionable claim.  It is a basic principle of evidence that "hearsay" is "a statement . . . offered in

6    evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  When a search report is

7    offered to prove what the report asserts, i.e. that a mark has been registered and that it is in

8    commercial use, this is classic inadmissible hearsay.  <u>See</u> 2 McCarthy § 11:88.  When, however, a

9    search report is offered to prove the effect of the report on the listener, i.e. to show *notice* to the

10   recipient, this does not fall within the definition of hearsay and is admissible evidence.  <u>See</u> <u>Entous</u>

11   <u>v. Viacom Int'l Inc.</u>, 151 F.Supp. 2d 1150, 1157 n.5 (C.D. Cal. 2001) (quoting 5 Weinstein &

12   Berger, *Weinstein's Federal Evidence*, § 801.11[5][a] (2nd. ed. 2000) ("Statements are not hearsay

13   when they are offered not for their truth but to prove the extent of a declarant's knowledge or a

14   recipient's notice of certain conditions.")).  The court overrules plaintiff's evidentiary objections to

15   the search reports.

16        In sum, the court concludes that plaintiff is charged with constructive notice of its potential

17   causes of action against defendant beginning at least as early as 1988 when it received the first of

18   multiple trademark search reports disclosing defendant's use of the name Hobbit Travel which has

19   been open, continuous and not insignificant.  The length of delay, from the time plaintiff should

20   have known of its cause of action to the time it actually filed suit in 2006, is at least eighteen years.

21

22        B.    <u>Reasonableness of Delay</u>

23        With the length of delay established as at least eighteen years, the court must next determine

24   whether plaintiff's delay may be excused as reasonable.  <u>Jarrow Formulas</u>, 304 F.3d at 838.  The

25   reasonableness of plaintiff's delay is considered in light of the time allotted by the relevant statute of

26   limitations period.  <u>Id.</u>  If a plaintiff files suit within the applicable period of limitations for his

27   claim, there is a strong presumption that laches does not bar the claims.  <u>Id.</u> at 835.  Conversely, if

28   any part of the allegedly wrongful conduct occurred outside of the limitations period, courts presume

UNITED STATES DISTRICT COURT
For the Northern District of California

1    that the plaintiff's claims are barred by laches.  Id. at 836–37.  In addition to comparison with the

2    relevant statute of limitations period, courts also consider whether the plaintiff has proffered a

3    legitimate excuse for its delay.  Id. at 838.

4         The Ninth Circuit has directed courts to balance additional factors in determining whether

5    the plaintiff's delay was unreasonable including: "(1) strength and value of the trademark rights

6    asserted (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if relief is denied; (4)

7    good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent

8    of harm suffered by the junior user because of senior user's delay." Tillamook, 465 F.3d at 1108

9    (citing E-Systems, 720 F.2d at 607).  Some of the E-Systems factors overlap with other prongs of the

10   laches analysis and are discussed by the court in other portions of this memorandum and order.  For

11   example, the court has already discussed the second E-Systems factor regarding plaintiff's diligence,

12   or lack thereof, in policing its mark as regards to defendant's use of the Hobbit mark, and the last E-

13   Systems factor, harm to the junior user, is discussed below in the context of prejudice to the

14   defendant.

15        Where a federal statute like the Lanham Act does not contain an explicit statute of

16   limitations, the Ninth Circuit presumes that Congress intended to "'borrow' the limitations period

17   from the most closely analogous action under state law." Jarrow Formulas, 304 F.3d at 836.  There

18   is some disagreement in the case law concerning the most closely analogous state law action for the

19   federal claims at issue in this case.  In Jarrow Formulas, a false advertising case brought under

20   Lanham Act section 43(a) subpart (1)(B), the parties agreed, and the Ninth Circuit held, that the

21   most analogous limitations period is California's period for fraud, which is three years.  Id. at 838.

22   On the other hand, the Ninth Circuit's more recent opinion in Glen Miller held that all Lanham Act

23   claims in general, including claims brought under Lanham Act section 43(a) in particular, are

24   governed by the limitations period in California's statutes for trademark infringement and dilution,

25   which is four years. Glen Miller, 454 F.3d at 997 n.11, 986 (holding that the statute of limitations

26   for "all of Plaintiffs' eleven causes of action," including those brought under Lanham Act § 43(a),

27   15 U.S.C. § 1125(a), and Lanham Act § 43(c), 15 U.S.C. § 1125(c), is four years).  Unlike the

28   federal Lanham Act claims asserted in this action, it is clear that the statute of limitations for the

California state law claims for dilution and unfair competition is four years.  See Cal. Bus. & Prof. Code § 17208; Cal. Civ. Proc. Code § 343.  For purposes of deciding the present action, this court need not resolve whether a three year or four year limitations period is applicable to the federal claims.  The length of delay in this case, at a minimum, is eighteen years, six times the statute of limitations using a three year period, and more than four times the statute of limitations using a four year period.  Under either scenario, a presumption of laches applies to each of plaintiff's federal and state law claims.

Next, the court must consider the validity of reasons proffered by the plaintiff to excuse its delay and overcome the presumption of laches.  Here, plaintiff proffers several excuses, each of which proves insufficient.  First, Tolkien Enterprises argues that its delay was not unreasonable because it did not learn of defendant's conduct until November 2003.  For the reasons previously explained, defendant's subjective ignorance and lack of curiosity prior to 2003 are not valid excuses since plaintiff is charged with constructive knowledge as of 1988.

Second, Tolkien Enterprises argues that the doctrine of progressive encroachment justifies its delay.  Under progressive encroachment, *de minimis* infringement does not obligate a trademark owner to sue.  Tillamook, 465 F.3d at 1110.  Instead, a trademark owner's obligation to sue arises when the junior user redirects or expands its business into different regions or markets bringing it into direct competition with the trademark owner.  Id., citing Grupo Gigante SA de CV v. Dallo & Co., 391 F.3d 1088, 1103; see also 6 McCarthy § 31:20.  Notably, however, "a junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment."  Tillamook, 465 F.3d at 1110, citing Prudential Ins., 694 F.2d at 1154 ("growth alone does not infringement make").

In Tillamook, the Ninth Circuit held that the defendant meat company's move into direct supermarket sales represented normal business growth and not progressive encroachment. Tillamook, 465 F.3d at 1110.  That the mark's senior user, a cheese company, preceded the meat company in making direct supermarket sales did not change the court's opinion that the meat company's expansion into supermarkets was a natural one.  Id.  The Ninth Circuit also stressed that the meat and cheese companies were not direct competitors, finding that the progressive

UNITED STATES DISTRICT COURT
For the Northern District of California

1   encroachment argument "would be a different story" if the meat company had begun selling cheese.

2   Id; see also Prudential Ins., 694 F.2d at 1154 (finding that a progressive encroachment claim failed

3   where an insurance company and a loan company did "not offer the same services to any substantial

4   extent").

5       In the present case, balancing the facts weighs against progressive encroachment. While

6   Tolkien may have had no obligation to sue a small one-shop brick and mortar infringer, defendant's

7   use of the mark was not de minimis.  By the 1980s, it operated three locations and had over fifty

8   employees.  Abramson Decl. Ex. C1; Woz Decl. Exs. D27, F4.  Its revenue increased steadily

9   throughout the late 1970s, 1980s and 1990s, generating over $1 billion in travel sales in its thirty-

10  year history.  Hobbit Travel has been referenced in hundreds of newspaper articles as well as in

11  radio broadcasts and national television shows.  Although primarily serving the state of Minnesota,

12  Hobbit Travel also sold travel services to residents outside that state.  Had plaintiff chosen to

13  examine Hobbit Travel, Hobbit Travel would not have been difficult to find.

14      Tolkien argues that Wozniak's expansion into internet sales brought Woziak into a new

15  national marketplace and squarely into competition with Tolkien.  However, like the meat

16  company's entrance into direct supermarket sales in Tillamook, Wozniak's expansion into internet

17  sales represented natural business growth for a company with an already growing national customer

18  base.  See Tillamook, 465 F.3d at 1110.  Given that Wozniak's move to the internet was the natural

19  outgrowth of its existing business, the fact that Tolkien's internet sales predate Wozniak's sales is

20  immaterial.  See id.; see also 6 McCarthy § 31:20.  Moreover, simply adopting a new form of

21  technology as it comes into being does not constitute progressive encroachment.  See Prudential,

22  694 F.2d at 1154 (expansion of television advertising not encroachment).

23      Progressive encroachment is also ill-suited to the facts at hand because Wozniak's growth

24  did not bring it into direct competition with Tolkien.  Even more distinct than cheese and meat (both

25  food products) or insurance and loans (both financial services), Tolkien and Wozniak's products do

26  not even fall within the same genre.  See Tillamook, 465 F.3d at 1110; Prudential Ins., 694 F.2d at

27  1154.  As in Prudential, Tolkien and Wozniak do "not offer the same services to any substantial

28  extent" because Tolkien's trademarks cover consumer goods and merchandise such as games,

UNITED STATES DISTRICT COURT
For the Northern District of California

1   clothing, jewelry and collectibles, and Wozniak's business involves only travel services.  See

2   Prudential Ins., 694 F.2d at 1154.  Wozniak has always sold travel services and travel services only,

3   and at no point in time has it sought to expand the type of services it sells, or use its mark in a

4   significantly different way.

5         The court is not unmindful that in some cases a strong mark may confer protection across

6   product and service boundaries.  See Carnival Brand Seafood Co. v. Carnival Brands, Inc., 187 F.3d

7   1307 (11th Cir. 1999); see also 4 McCarthy § 24:20.  In such cases, a senior user may prevent others

8   from using its mark in product areas currently unoccupied by the senior user so long as those

9   markets are within the natural zone of expansion for the senior user's business.  See id.; See, e.g.,

10  Jaguar Cars Ltd. v. Skandrani, 771 F. Supp. 1178 (S.D. Fla. 1991) (strength of automaker's Jaguar

11  mark prevents competitor's use of Jaguar in naming cologne); Rosenthal A.G. v. Ritelite, Ltd., 986

12  F. Supp. 133 (E.D.N.Y. 1997) (strength of china and dinnerware maker's mark prevents competitor

13  from using the same mark to enter religious plate and cup market).  Yet, a senior user may not

14  prevent use of a mark where the junior user enters a product market outside of the senior user's

15  natural zone of expansion.  See, e.g., Physicians Formula Cosmetics, Inc. v. W. Cabot Cosmetics,

16  Inc., 857 F.2d 80, 83 (2d Cir. 1988) (senior user in soap market may not prevent use of mark by

17  cosmetics and skin cream company where soap maker has sold exclusively bar soap for decades

18  without moving to expand).

19        In the present case, the natural expansion of Tolkien's Hobbit mark did not extend to travel

20  services at the time Wozniak opened Hobbit Travel.  From 1937 when The Hobbit was published

21  through the late 1970s when Wozniak began his business, Tolkien and its predecessors in interest

22  used the Hobbit mark exclusively to market television and theatrical films and related merchandise

23  such as calendars, posters, records, puzzles, board games, figurines, and clothing.  In 1982, Tolkien

24  licensed a nature trail that recreates the journey of The Hobbit in the redwood forests of Humboldt

25  County, California.  The record reflects, however, that this is plaintiff's only foray into travel-related

26  services throughout the 1970s, 1980s and 1990s when defendant's travel agency was growing

27  increasingly large in size.

28        It was not until 2002, that Tolkien entered into a two-year licensing arrangement with Air

24

UNITED STATES DISTRICT COURT
For the Northern District of California

1    New Zealand to offer travel promotions in connection with the theatrical release of Peter Jackson's

2    *The Lord of the Rings* trilogy.  Subsequently in 2006, Tolkien arranged with Virgin Atlantic to offer

3    travel promotions in connection with a stage musical produced by Kevin Wallace Limited.  In the

4    future, Tolkien expects to offer more travel promotions in connection with the anticipated release of

5    New Line Cinema's *The Hobbit* movie.  This late and sporadic foray into the travel services market

6    does not aid Tolkien in countering laches.  As Judge Hand explained, "The owner's rights in . . .

7    appendant markets are easily lost; they must be asserted early lest they be made the means of

8    reaping a harvest which others have sown."  Tillamook Country Smoker, Inc. v. Tillamook County

9    Creamery Ass'n ("Country Smoker"), 311 F. Supp. 2d 1023, 1033 (D. Or. 2004) (quoting Dwinell-

10   Wright Co. v. White House Milk Co., 132 F.2d 822, 825 (2d Cir. 1943)); see also E-Systems, Inc.,

11   720 F.2d at 607 (considering competition between the senior and junior user as a laches

12   consideration).  When balanced against Wozniak's consistent, thirty-year presence in the market for

13   travel-related services, equity gives little weight to either Tolkien's recent and sporadic interest in

14   travel or its desire to exploit this market in the future.

15           The third and final excuse plaintiff proffers to justify its delay relates specifically to its

16   federal claim for trademark dilution.  In response to the U.S. Supreme Court's ruling in Moseley v.

17   V Secret Catalogue, Inc., 537 U.S. 418, 433 (2003), that a federal dilution claim under 15 U.S.C.

18   section 1125(c)(1) requires an showing of *actual*, rather than a *likelihood* of dilution, Congress

19   passed the Trademark Dilution Revision Act ("TDRA") of 2006.  The Act overruled Moseley and

20   amended the statute to make the "likelihood of dilution" standard explicit.  See Pub. L. No. 109-

21   312, 120 Stat. 1730, 1733; see also, H.R. Rep. 109-23 ("The Mosely [sic] standard creates an undue

22   burden for trademark holders who contest diluting uses and should be revised").

23           Tolkien argues that its claim for dilution is based only upon a likelihood of dilution, and that

24   because only claims for actual dilution were actionable prior to 2006, it brought its claim at the

25   earliest possible time, shortly after Congress passed the TDRA.  This argument is specious.  First,

26   Tolkien's dilution claim, as pled in the complaint, is for actual, not likelihood of dilution.

27   Complaint ¶ 61 (alleging that Wozniak's "unauthorized use of the marks has and will *actually* dilute

28   the distinctiveness of the HOBBIT Marks").  Second, regardless of whether the legal standard

25

required a showing of actual or likelihood of dilution, a federal cause of action for dilution has

existed since 1995 when Congress passed the Federal Trademark Dilution Act ("FTDA").  P.L. 104-

98, 109 Stat. 985.  Under California law, a state cause of action for dilution has existed since 1967.

Cal. Code Ann. § 14330(a) (replaced by Cal. Bus. & Prof. Code § 14247).  Third, before the

Supreme Court's decision in Moseley requiring a showing of actual dilution, the Ninth Circuit

applied a "likelihood of dilution" standard to claims brought under the FTDA.  Horphag Research

Ltd. v. Garcia, 475 F.3d 1029, 1036 (9th Cir. 2007) (noting that Moseley modified the Ninth Circuit

test for dilution).

In sum, the court concludes that plaintiff's delay of at least eighteen years is unreasonable.

Because the length of delay far exceeds the statute of limitations period, a presumption of laches

applies. This presumption is not overcome by any excuses plaintiff offers for its delay.  Plaintiff

brought this action in 2006 to enjoin defendant's use of the mark Hobbit Travel, thirty years after

defendant had adopted that mark, and eighteen years after plaintiff received the first of multiple

trademark search reports informing it of defendant's potentially unlawful use.  Despite having

constructive notice of defendant's use, plaintiff did nothing about it—no communications were

made, no letters were written, and no lawsuits were filed against defendant or any of the other

entities operating travel agencies under the Hobbit mark.  The presumption of laches is not

overcome by any excuses plaintiff offers for its delay, including the doctrine of progressive

encroachment.

II.      Prejudice to Defendant

Because "'mere delay' by itself" is insufficient to invoke the doctrine of laches, once a court

finds that plaintiff has unreasonably delayed, it must then consider whether the defendant has

suffered prejudice.  NAACP v. NAACP Legal Defense & Education Fund, Inc., 753 F.2d 131,

138–139 (D.C. Cir. 1985).  "Courts have recognized two chief forms of prejudice in the laches

context—evidentiary and expectations-based."  Danjaq LLC v. Sony Corp., 263 F.3d 942, 955 (9th

Cir. 2001).  "Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or

witnesses whose memories have faded or who have died."  Id.  Expectations-based prejudice derives

UNITED STATES DISTRICT COURT
For the Northern District of California

1  from a defendant "[taking] actions or [suffering] consequences that it would not have, had the

2  plaintiff brought suit promptly." Id. For example, a defendant suffers prejudice if, in reliance on

3  plaintiff's delay, she invests labor and capital to build a trademark's goodwill and future value.

4  NAACP, 753 F.2d at 138. Similarly, "a defendant may establish prejudice by showing that during

5  the delay, it invested money to expand its business or entered into business transactions based on his

6  presumed rights." Glen Miller, 454 F.3d at 999.

7        The economic prejudice would be severe if Wozniak Travel now lost the right to use the

8  name Hobbit Travel. In business since 1976, Wozniak Travel has spent tens of millions of dollars

9  on advertising in an effort to build up name recognition and goodwill. Wozniak Dec ¶ 6, Exhs.

10  D1–27. Advertisements for Hobbit Travel appeared in leading regional papers including the

11  *Minneapolis Star Tribune* and *St. Paul Pioneer Press* beginning in 1977. Wozniak Dec. ¶ 8.

12  Wozniak Travel steadily increased its advertising budget over time, spending a few thousand dollars

13  per year in the 1970s, over 100,000 dollars per year by the late 1980s, and half a million dollars per

14  year by the mid 1990s. Wozniak Dec ¶ 6, Exhs. D1–27. Wozniak Travel's annual advertising

15  expenditures surpassed one million dollars in 2000. Wozniak Dec ¶ 6, Exhs. D1–27. Wozniak

16  Travel has also invested substantial time in public relations to promote Hobbit Travel. Wozniak

17  Dec., Exh. M, p. 288:7-24. Beginning in the late 1970s, Wozniak appeared on local television

18  shows to discuss travel. Id. Such appearances grew both more substantial and more common

19  overtime as Wozniak reached national audiences in two Oprah Winfrey Show appearances in 1990

20  and 1992 and again in at least three national news broadcasts in the late 1990s and early 2000s. Id.

21  Such substantial and regular investments into Hobbit Travel's goodwill demonstrate that Wozniak

22  Travel would now suffer economic prejudice if it were enjoined from operating under the name

23  Hobbit Travel. See Jarrow Formulas, 304 F.3d at 840 (prejudice existed where a "long-term

24  investment" was made in marketing nutrition product to the public).

25        Evidentiary prejudice also inequitably harms Wozniak Travel. Evidentiary prejudice exists

26  when relevant records are likely missing due to the passage of time or witnesses have died since the

27  cause of action accrued. Danjaq, 263 F.3d at 955–956. Likely in part due to the passage of time,

28  Wozniak Travel now cannot present complete financial records, publicity records or logs concerning

27

UNITED STATES DISTRICT COURT
For the Northern District of California

1   its Hobbit Travel website.  Wozniak Dec. ¶¶ 6, 10, 13.  Wozniak Travel also cannot learn potentially

2   important information from Tolkien Enterprises's now-deceased former trademark counsel.

3   Considering this evidentiary prejudice alongside the overwhelming economic prejudice, the court

4   finds that the overall prejudice is substantial.

5        Without materially disputing the economic and evidentiary harm, Tolkien Enterprises

6   fashions a creative argument to contend that prejudice cannot be established for the purposes of

7   laches because Wozniak Travel abandoned its mark through naked licensing.  Abandonment through

8   naked licensing occurs when a trademark owner fails to take the reasonable steps necessary to

9   monitor the quality of goods produced by a licensee.  First Interstate Bancorp v. Stenquist, 1990 WL

10   300321, at *3 (N.D. Cal. July 13, 1990) (Patel, J.).  This failure to ensure quality control "may result

11   in the trademark ceasing to function as a symbol of quality and controlled source."  3 McCarthy §

12   18:48.  As a result, "a court may find that the trademark owner has abandoned the trademark, in

13   which case the owner would be estopped from asserting rights to the trademark."  Barcamerica Int'l

14   USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 596 (9th Cir. 2002) (citing Moore Bus. Forms,

15   Inc. v. Ryu, 960 F.2d 486, 489 (5th Cir. 1992)).

16        Tolkien Enterprises argues that Wozniak Travel issued a naked license to Wisconsin-based

17   Friedman's Hobbit Travel when Wozniak Travel acquiesced to the naming of Friedman's Hobbit

18   Travel in 1982 and failed to place any conditions on Friedman's right to use the Hobbit name.

19   Wozniak Supp. Dec., Exh. M, 359:1–18.  Similarly, Tolkien Enterprises argues that Wozniak Travel

20   again issued a naked license in the early 1990s when it participated in a joint advertising campaign

21   that listed the Chicago-based Hobbit International as Hobbit Travel.  Wozniak Supp. Dec., Exh. M,

22   59:6–60:13.  As a result of these "naked licenses," according to Tolkien Enterprises, Wozniak

23   Travel abandoned its right to use the name Hobbit Travel and therefore cannot suffer the prejudice

24   required to invoke laches.

25        This argument is a creative one because abandonment through naked licensing is typically

26   used as an affirmative defense to infringement.  See Blue Magic Products, Inc. v. Blue Magic, Inc.,

27   2001 WL 34098657, *1 (E.D. Cal. Sept. 5, 2001); Emachines, Inc. v. Ready Access Memory, Inc.,

28   2001 WL 456404, *4 (C.D. Cal. March 5, 2001).  Here, however, Tolkien Enterprises presents

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   abandonment not as a defense to a counterclaim of infringement—as defendant has brought no such

2   claim—but instead as a means to negate the prejudice element of defendant's laches defense.

3   Wozniak Travel contends as a preliminary matter that Tolkien Enterprises may not raise an

4   abandonment argument on motion for summary judgment because abandonment was not pled as an

5   affirmative defense.  However, because Tolkien Enterprises uses abandonment not as an affirmative

6   defense, but to negate an element of the laches defense, affirmative pleading is not required, and the

7   court will consider Tolkien's argument on the merits.

8        The court finds no cases applying naked licensing to bar a party from *defending* an

9   infringement claim on the basis of laches, as Tolkien Enterprises suggests is appropriate here.

10   Tolkien Enterprises argues for an absolutist reading of precedent, citing this court's ruling that

11   naked licensing is "inherently deceptive and constitutes abandonment of any rights to the

12   trademark."  See First Interstate, 1990 WL 300321, at *3.  However, to zero in on this language

13   alone is to lose the benefits of context in an attempt to infer a broad rule about the effects of naked

14   licensing.  The context of Tolkien Enterprises's supporting case law reveals that the cases cited

15   stand only for the proposition that a claimant may not *advance* an infringement claim after granting

16   a naked license to his mark.  See id.; Pa. Dutch Co., Inc. v. Pa. Amish Co., Inc., 1974 WL 20223

17   (Pa. Com. Pl. Aug. 26, 1974).  See also Barcamerica, 289 F.3d at 589 (holding that claimant may not

18   pursue infringement claim after issuing naked license); Halo Mgmt., LLC v. Interland, Inc., 2004

19   WL 1781013 (N.D. Cal. Aug. 10, 2004) (Patel, J.) (holding that claimant may not pursue

20   infringement claim after issuing naked license).

21        In First Interstate, abandonment through naked licensing barred the defendant realtor from

22   asserting a counterclaim for trademark infringement.  The defendant realtor had executed a written

23   contract transferring the right to use the name First Interstate Realty to another without imposing any

24   conditions on the mark's use.  See First Interstate, 1990 WL 300321, at *1.  The court determined

25   that this contract constituted a naked license because the defendant realtor failed to protect his mark

26   by not imposing any conditions on use.  Id. at *4.  In turn, this naked license barred the defendant

27   realtor from asserting against plaintiff a counterclaim for trademark infringement.  Id.  Significantly,

28   however, this court did not bar defendant realtor's laches defense as a de facto result of the realtor's

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   naked license.  Id.; First Interstate Bancorp v. Stenquist ("First Interstate II"), 1990 WL 299251

2   (N.D. Cal. Dec. 12, 1990) (Patel, J.).  Nor did the court hold that defendant's naked license

3   prevented defendant from showing prejudice.  First Interstate II, 1990 WL 299251 at *4.  Instead, in

4   First Interstate II, this court considered laches in the context of the plaintiff banker's eight-year

5   delay since the defendant realtor's initial use and only year-long delay since the realtor's naked

6   licensing.  Id. at *4.  These relatively short delays, in combination with naked licensing, prompted

7   the court to rule that laches did not apply.  Id.

8          The second principal case cited by Tolkien Enterprises to support its naked licensing theory

9   is a thirty-year-old case from the Pennsylvania Court of Common Pleas.  Pa. Dutch Co., 1974 WL

10  20223.  The persuasive weight of such precedent is questionable.  Further, like the First Interstate

11  holding, Pennsylvania Dutch Co. only suggests that a claimant's rights are limited when he has

12  issued a naked license.  Id. at *47.  In Pennsylvania Dutch Co., the plaintiff novelty candy company

13  filed an infringement claim against another novelty candy company operating under a similar name.

14  Id.  The court held that the plaintiff candy company could not maintain its infringement claim in

15  light of the fact that plaintiff allowed a third candy company to sell similar candies using packaging

16  indistinguishable from the plaintiff's own.  Id.  The case did not concern laches or the result of

17  naked licensing by a defendant faced with an infringement claim.  Id.

18         Without any case law to support the proposition that naked licensing precludes a party from

19  defending against an infringement claim on the basis of laches, the court hesitates to adopt that rule

20  here.  First Interstate and Pennsylvania Dutch Co. both held that a party may not pursue an

21  infringement claim where the party failed by way of naked licensing to protect its mark in the past.

22  First Interstate II, 1990 WL 299251; Pa. Dutch Co., 1974 WL 20223.  These cases suggest Wozniak

23  Travel may well face difficulties if it asserts an infringement claim and attempts to exclude others

24  from using the name Hobbit Travel.  But the right to exclude is not at issue here—Wozniak does not

25  assert a counterclaim of infringement against Tolkien or any other entity.  Abandonment through

26  naked licensing has never been applied in a case like this where a defendant asserts only the right to

27  continue its *use* of a mark, and not its right to *exclude* use by another.  The court declines to adopt

28  such a rule today.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Moreover, <u>First Interstate II</u> suggests that naked licensing is but one factor in applying laches

2    and must be considered in the context of plaintiff's delay.  <u>First Interstate II</u>, 1990 WL 299251 at *4.

3    In <u>First Interstate II</u>, laches did not apply because only a relatively short period of time elapsed since

4    the defendant realtor's initial use and naked licensing.  <u>Id</u>.  The present case is distinguishable by the

5    long period of Tolkien Enterprises's overall delay as well as Tolkien Enterprises's delay since the

6    alleged naked licensing occurred in 1982, in the case of Friedman's Hobbit Travel, and the early

7    1990s, in the case of Hobbit International.  These over decade-long delays between Wozniak

8    Travel's alleged naked licensing and Tolkien Enterprises's present suit contrast significantly with

9    the one-year filing delay after the naked licensing in <u>First Interstate II</u>.  <u>See</u> <u>id</u>.

10    In looking at the purpose of a laches defense, it proves too much to deny that Wozniak

11    Travel would suffer prejudice if Tolkien Enterprises were to proceed with its current claims.  To

12    preclude laches based on the alleged naked licensing would depart too widely from precedent and

13    work unfairness in what should be an equitable doctrine designed to achieve a just outcome.  As a

14    result, the court concludes that defendant has suffered both economic and evidentiary prejudice as a

15    result of plaintiff's delay, and that defendant's conduct and relationships with respect to Friedman's

16    Hobbit Travel and Hobbit International, allegedly a "naked license," do not defeat defendant's

17    showing of prejudice.

18

19    <u>CONCLUSION</u>

20    On equitable consideration of all factors involved and upon the conclusion that the status quo

21    will best protect market competition and defendant's investment in Hobbit Travel, defendant's

22    motion for summary judgment on the basis of laches is GRANTED.  Plaintiff's motion for summary

23    judgment on the basis of laches is DENIED.  Each of plaintiff's claims against defendant is

24    DISMISSED.

25    IT IS SO ORDERED.

26    Dated: July 29, 2008

27                                                                    _____

28                                                                    MARILYN HALL PATEL
                                                                      United States District Court Judge
                                                                      Northern District of California